USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/13/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID BORUS,

                          Plaintiff,

        - against -

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                         Defendant.

**REPORT AND
RECOMMENDATION**

**09 Civ. 4723 (PAC) (RLE)**

**To the HONORABLE PAUL A. CROTTY, U.S.D.J.:**

## I. INTRODUCTION

Plaintiff David Borus commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability benefits. Borus moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to reverse the Commissioner's decision that he was not disabled for sedentary work, and to remand the case solely for the calculation of benefits. On March 26, 2010, the Commissioner cross-moved for a judgment on the pleadings, asking the Court to affirm the Commissioner's decision. For the reasons that follow, I recommend that Borus's motion be **GRANTED**, and the case be **REMANDED** to the Social Security Agency ("the SSA") solely for the calculation of benefits.

## II. BACKGROUND

### A. Procedural History

On April 13, 2005, Borus filed an application for disability insurance benefits with the the SSA, alleging that he became disabled on December 6, 2004. (A.R. at 50-53.)[1] Borus's

---

[1] "A.R." refers to the administrative record filed by the Commissioner with his Answer. (*See* Doc. 9.)

application was denied, and he requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 42.) On December 11, 2006, Borus and his attorney appeared at a hearing before ALJ Robin J. Arzt. (*Id.* at 648-78.) The ALJ subsequently issued an opinion finding that Borus was not disabled under the Act and was not entitled to disability benefits. (*Id.* at 21-29.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Borus's request for review on March 16, 2009. (*Id.* at 5-8.) Borus filed this action on May 20, 2009.

## B. The ALJ Hearing

### 1. Borus's Testimony at the December 11, 2006 Hearing

Borus was born on June 24, 1960. (*Id.* at 652.) He completed a four-year college, and took advanced courses in finance after graduation. (*Id.* at 653-54.) Borus was employed at various firms as a stockbroker from 1986 to 1997; as a head trader from 1997 to 2001; and as a stock trade support worker from 2001 until December 3, 2004. (*Id.* at 654-57.) Borus's job tasks consisted mostly of sitting at a desk, making phone calls and doing data entry. (*Id.* at 655.) Approximately once a week, Borus was required to carry boxes of paper that weighed over ten pounds. (*Id.*) He testified that sometime prior to 2004 he developed shooting pain in both of his legs that made it difficult for him to stand. (*Id.* at 672.) On December 6, 2004, Borus had back surgery to treat his leg pain, and has been unable to work since. (*Id.* at 656.)

Although Borus testified that the surgery eliminated his leg pain (*Id.* at 672), he stated that he had felt constant pain in his lower back and abdomen since the surgery, and that he experienced spasms and sharp pains in those areas a couple of times a week. (*Id.* at 656, 660.) On a scale of one to ten, he stated that his level of pain was at a minimum of six all of the time. (*Id.* at 672.) The back surgery weakened him significantly, and Borus estimated that he was currently at seventy-five to eighty percent of the body strength he had before the surgery. (*Id.* at

2

668-69.)

Borus was prescribed Oxycontin to treat the pain, and the medication reduced but did not eliminate his pain. (*Id.* at 662, 672.) He complained that the medication caused him to become constipated and to develop hemorrhoids. (*Id.* at 662.) Borus also testified that he had surgery on both of his hands in 2005, which caused his knuckles to swell occasionally. (*Id.* at 663-65.) He testified that he no longer experiences pain in either hand and that he was able to use his hands to take care of himself and do things like open doors and pick up coins. (*Id.* at 664-65, 674.)

At the time of the hearing, Borus testified that he was able to walk twenty to twenty-five blocks without resting, and that he was able to stand for about one hour before he needed to sit. (*Id.* at 666.) He stated that he could only sit for an hour or two before he would need to rest and recuperate by lying down and taking a nap. (*Id.* at 666, 668) Borus also stated that he was able to carry an eight-pound gallon of milk, but that he would be unable to carry anything much heavier. (*Id.* at 667.) He testified that he was not able to work at his old job because of the pain and because he didn't think that he could handle the work physically. (*Id.* at 668-71.)

### 2. Medical Evidence

Borus first began experiencing back pain in 2002. (*Id.* at 552) After he started having trouble walking and standing, he sought treatment from Dr. Patrick O'Leary, a spine surgeon, on April 26, 2004. (*Id.* at 356.) Dr. O'Leary found that Borus had significant sciatica[2] related to lumbar spinal instability. (*Id.*) A May 12, 2004 CT myelogram of Borus's spine revealed a

---

[2]Sciatica is "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity along the posterior or lateral aspect, and most commonly caused by protrusion of a low lumbar intervertebral disk." *Dorland's Illustrated Medical Dictionary* 1493 (28th ed. 1994).

Grade-II/IV anterolisthesis of L5 on S1 with bilateral lysis,[3] and severe narrowing of the L5/S1

foramen.[4] (*Id.* at 361.) Dr. O'Leary reviewed the scans and concluded that Borus had "radicular

pain along the L5 exit root in association with spondylolysis[5] and spondylolisthesis[6] at the L5-SI

segment." (*Id.* at 357.)

On December 1, 2004, Dr. Gerald Bahr evaluated Borus in preparation for Borus's spine

surgery and diagnosed Borus with congenital adrenal insufficiency. (*Id.* at 353.) Dr. O'Leary

performed spine surgery on Borus on December 7, 2004, a procedure that included anterior

lumbar diskectomies and fusions of the L4-5 and L5-S1, using Harms cages, a Moss Miami

titanium system, and bone grafts. (*Id.* at 110.) Borus was discharged from the hospital on

December 11, 2004, and his post-operative diagnosis was spondylolysis and spondylolisthesis of

the L5-S1 with marked disk degeneration, foraminal stenosis[7] and right sciatica; and disk

degeneration of the L4-5. (*Id.* at 349.) In the days immediately following the surgery, no post-

operative complications were noted, and Borus was characterized as "relatively well." (*Id.* at

344-46.)

Borus was initially referred to Dr. Kesselman for pain management following the

---

[3]Lysis is a term that generally denotes dissolution, decomposition, disintegration, or destruction. *Dorland's Illustrated Medical Dictionary* 973 (28th ed. 1994).

[4]Foramen is a general term for a natural opening or passage, especially one into or through a bone. *Dorland's Illustrated Medical Dictionary* 649 (28th ed. 1994).

[5]Spondylolysis is defined as a "degenerative joint disease affecting the lumbar vertebrae and intervertebral disks, causing pain and stiffness, sometimes with sciatic radiation due to nerve root pressure by associated protruding disks or osteophytes." *Dorland's Illustrated Medical Dictionary* 1564 (28th ed. 1994).

[6]Spondylolisthesis is defined as "the forward displacement of one vertebra over another."*Dorland's Illustrated Medical Dictionary* 1563 (28th ed. 1994).

[7]Spinal stenosis is defined as a "narrowing of the vertebral canal, nerve root canals, or intervertebra foramina of the lumbar spine caused by encroachment of bone upon the space." *Dorland's Illustrated Medical Dictionary* 1576 (28th ed. 1994).

4

surgery, and Dr. Kesselman informed Dr. O'Leary that she believed that Borus was being prescribed too much Oxycontin. (*Id.* at 512.) Borus did not believe that Dr. Kesselman was adequately treating his pain, and he requested to see another physician. (*Id.* at 507.) He was referred to Dr. Richard Rho, who began treating him in late December 2004. (*Id.* at 506, 592.) Dr. Rho noted that Borus was experiencing symptoms of low back pain that radiated from his hip/buttock, and he diagnosed him with lumbar fusion, chronic low back pain, and lumbar radiculopathy.[8] (*Id.* at 592.)

Borus also received post-operative treatment from Dr. Edward Rachlin, a specialist in orthopedic surgery and spine rehabilitation. (*Id.* at 333.) On January 20, 2005, Dr. Rachlin noted that Borus experienced pain and numbness in his lower back and abdomen, and was able to walk ten to twenty blocks and to sit for one hour. (*Id.*) He observed that Borus walked with a "good gait." (*Id.*) After Dr. Rachlin saw Borus for a follow-up appointment on March 3, 2005, he noted that Borus continued to experience low back pain, that his walking tolerance was thirty to sixty minutes, and that his sitting tolerance was two to three hours. (*Id.* at 330.) Borus also stated that he experienced pain in his hands, and that he had been diagnosed with carpal tunnel syndrome bilaterally. (*Id.*) On April 25, 2005, Dr. Rachlin reported that Borus's condition had improved, but that he was not able to work, had a Class 5 severe limitation of functional capacity, and was incapable of minimal sedentary activity. (*Id.* at 524.)

Dr. Salvatore Lenzo, a hand surgeon, evaluated Borus in May 2005, in response to Borus's complaints of numbness in his right hand. (*Id.* at 194.) Dr. Lenzo observed evidence of a

---

[8]Radiculopathy is defined as a "disease of the nerve roots," and as a "compression of the cauda equina due to encroachment upon a congenitally small spinal canal by spondylosis." *Dorland's Illustrated Medical Dictionary* 1564 (28th ed. 1994).

"locked trigger thumb" and of "double crush syndrome," and recommended carpal tunnel release surgery. (*Id.*) Dr. Lenzo operated on Borus's right hand on June 6, 2005. (*Id.* at 201-06.) After Borus's post-surgical follow-up examination, Dr. Lenzo noted that the wound was healing well. (*Id.* at 200.)

Dr. Rachlin conducted a seven-month post-operation examination on July 1, 2005, and noted that Borus still experienced low back pain, with occasional "shooting pain and pinches." (*Id.* at 324.) Dr. Rachlin noted that Borus's sitting tolerance was thirty-two to forty minutes, and that he was able to walk for one hour to one and a half hours. (*Id.*) Dr. Rachlin examined Borus again on November 22, 2005, and noted that Borus continued to suffer low back pain and occasional pain in his legs. (*Id.* at 321.) At that time, Borus's walking tolerance was twenty minutes and his sitting tolerance was thirty minutes. (*Id.*) Dr. Rachlin also noted that Borus walked with a "good gait" and was able to walk on his toes and heels. (*Id.*) X-rays taken at Borus's July and November examinations revealed that the fusion was healing well. (*Id.* at 321, 324.) Dr. Rachlin completed forms for Borus's insurance carrier in August and December 2005, and on both forms he noted that Borus had "severe limitations of functional capacity," and that he was "incapable of (minimal) sedentary activity." (*Id.* at 522, 523.)

Dr. Rachlin examined Borus three times in 2006. On February 16, 2006, Dr. Rachlin noted that Borus still experienced low back pain "every once in a while," and that Borus's walking tolerance and sitting tolerance were both thirty minutes to forty-five minutes. (*Id.* at 318) Borus also informed Dr. Rachlin that he continued to take 20 mgs of Oxycontin three times a day for pain management, but that he would attempt to decrease the medication. (*Id.*) On June 13, 2006, Dr. Rachlin noted that Borus continued to experience back pain and stomach pain, and that Borus's walking tolerance and sitting tolerance were both one to two hours. (*Id.* at 313.) On

October 12, 2006, Dr. Rachlin noted that Borus continued "to experience lumbar pain all day, and that he was capable of walking two miles and had no problems sitting or standing." (*Id.* at 310.) He also noted that Borus had a colonoscopy for rectal bleeding in September 2006, and that a polyp[9] was found. (*Id.*) Dr. Rachlin ordered a CAT scan and myelogram to determine the cause of Borus's continued low back pain. (*Id.*) At each examination, Dr. Rachlin reviewed x-rays of Borus's spine, and noted that the fusion was solid and that the hardware was still intact. (*Id.* at 310, 313, 318.)

On December 19, 2006, Dr. Rho examined Borus and completed a report on his medical condition that included a functional assessment. (*Id.* at 592-603.) Dr. Rho noted that Borus's ability to do physical tasks was limited, and that during an eight hour work day he was only able to occasionally lift and carry five pounds, stand and/or walk for up to two hours, and sit for no more than six hours. (*Id.* at 602.)

### 3. ALJ's Findings

In a decision issued on February 19, 2006, the ALJ concluded that Borus's conditions did not preclude him from performing the demands of sedentary work and that he was not disabled under the Act. (*Id.* at 28.) The ALJ determined that the subjective symptoms reported by Borus were inconsistent with the objective medical evidence, and that there were no clinical or test findings to support a finding that Borus continued to suffer a marked physical limitation post-surgery. (*Id.* at 25-26.) The ALJ concluded that Borus was capable of performing the full range of sedentary work by July 2005, and that he was able to perform his past relevant work as a stockbroker at that time. (*Id.* at 26-27.) Accordingly, the ALJ determined that Borus had not

---

[9]A polyp is defined as a "morbid excrescence, or protruding growth, from mucus membrane." *Dorland's Illustrated Medical Dictionary* 1331 (28th ed. 1994).

been disabled as defined under the Act at any time since December 6, 2004, through the date of the decision. (*Id.* at 27.)

## C. Appeal's Council Review

After the ALJ's decision, Borus submitted additional treatment reports from Dr. Rachlin and Dr. Saul Agus to the Appeals Council. (*Id.* at 8.) The records submitted from Dr. Rachlin pertain to his January 27, 2007 evaluation of Borus, where he noted that Borus continued to experience low back pain. (*Id.* at 615.) Borus reported that he continued to take Oxycontin, and that he still felt weak. (*Id.*) Borus stated that he could walk for two hours in good weather and could sit for one to two hours. (*Id.*) Dr. Rachlin noted that Borus's insurance company did not approve the CAT scan and myelogram that were previously requested. (*Id.*) In response to Borus's complaints of rectal discomfort, poor appetite, and weight loss, on August 30, 2006, Dr. Agus performed an evaluation. (*Id.* at 646.) He noted that Borus appeared to be chronically ill, and that his rectal pain and hemorrhoids were likely exacerbated by the pain killers. (*Id.*) Dr. Agus performed a colonoscopy on September 16, 2006, which revealed diverticulosis, a benign polyp, and moderate to large internal hemorrhoids. (*Id.* at 647.) The Appeals Council denied Borus's request for review on March 16, 2009. (*Id.* at 5.)

## III. DISCUSSION

### A. Standard of Review

A reviewing court does not determine *de novo* whether a claimant is disabled. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (internal citations omitted). Rather, the court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such evidence is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (internal

citations omitted). When a reviewing court concludes that the SSA applied the incorrect legal standard, the SSA's decision should be reversed. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (internal citations omitted).

If the Court determines that the correct legal standard has been applied, and the Commissioner's finding is supported by substantial evidence, the reviewing court shall deem the Commissioner's findings of fact conclusive and affirm the decision. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the administrative record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). New evidence that is submitted to the Appeals Council becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision, provided the evidence is new and material and relates to the period before the ALJ's decision. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).

**B. Evaluation of Disability Claims**

Under the Act, every individual who is under a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The

disability must be of "such severity that [the claimant] is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner is

required to conduct a five-step inquiry: (1) determine whether the claimant is engaged in any

substantial gainful activity; (2) if so, determine whether the claimant has a "severe impairment"

which significantly limits his ability to work; (3) if so, determine whether the impairment is one

of the conditions for which the Commissioner presumes disability; (4) if not, determine whether

the claimant is able to perform his past work despite the disability; and (5) if not, determine

whether the claimant can perform other work. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999);

20 C.F.R. § 404.1520.

The Commissioner must assess the claimant's residual functional capacity ("RFC") to

apply the fourth and fifth steps of the inquiry to the claimant. A claimant's RFC represents the

most that claimant can do despite limitations caused by his impairments and related symptoms.

20 C.F.R. § 404.1545(a). The Commissioner must consider objective medical evidence, opinions

of examining or treating physicians, subjective evidence submitted by the claimant, as well as

the claimant's background. *Mongeur*, 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d 122,

124 (2d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Rivera v. Harris*, 623

F.2d 212, 216 (2d Cir. 1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978)); 20 C.F.R.

§ 404.1527(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's

exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push, and pull. 20

C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ must also evaluate the claimant's nonexertional

limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b),
404.1569(a).

The claimant bears the burden of proving the first four steps, while the burden of proving
the fifth is on the Commissioner. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing
*Carroll v. Sec'y of Dep't of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). If a
claimant proves that he is not working, that he has a severe impairment which significantly
limits his physical or mental ability to do basic work activities, and that he cannot return to his
prior form of work, but the impairment is not listed in, or medically equivalent to an impairment
listed in, Appendix 1 of the regulations, the burden then shifts to the Commissioner to prove that
there exists other gainful work in the national economy which the claimant could perform. *See
Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Schall v. Apfel*, 134 F.3d 496, 501 (2d Cir.
1998) (citing *Perez*, 77 F.3d at 46; 20 C.F.R. §§ 404.1520, 416.920); *Balsamo v. Chater*, 142
F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll*, 705 F.2d at 642).

**C. The Treating Physician Rule**

The report of a claimant's treating physician is generally given more weight than other
reports and will be controlling if it is "well-supported by medically acceptable clinical and
laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in
[the] case record." 20 C.F.R. § 404.1527(d)(2). When the treating physician's opinion is not
given controlling weight, the ALJ "must consider various 'factors' to determine how much
weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20
C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature, and extent of the
treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the
consistency of the opinion with the entirety of the record; (4) whether the treating physician is a

11

specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)(i-ii) & (d)(3-6). The ALJ is required to explain the weight he ultimately gives to the opinions of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). The ALJ is not permitted to arbitrarily substitute his own judgment or view of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

**D. Issues on Appeal**

Borus advances three arguments that the Commissioner's decision should be reversed or remanded. Borus argues that the ALJ's conclusion that Borus's adrenal insufficiency, rectal problems, and hand problems were not severe requires a remand. (Pl.'s Mem. of Law ("Pl.'s Mem.") 8-10.) Borus further argues that the ALJ's decision that he was capable of performing sedentary work was not supported by substantial evidence because the ALJ failed to properly take into account the opinions of Borus's treating physician. (*Id.* at 10-20.) Finally, Borus contends that the ALJ inappropriately relied upon the Medical Vocational Guidelines to determine that Borus could perform work other than his past relevant work as a stockbroker. (*Id.* at 20-24.)

**1. The ALJ's Determination that Borus's Adrenal Insufficiency, Hand Problems, and Rectal Problems were not Severe was Supported by Substantial Evidence**

The ALJ determined that Borus's low back pain constituted a severe impairment, but that his adrenal insufficiency, rectal problems, and hand problems were not severe because they did not impose significant limits on Borus's basic work-related activities. (A.R. at 28.) The Court finds that each of these determinations was supported by substantial evidence.

Borus testified that his congenital adrenal gland condition was "under control," provided that he took his medication. (*Id.* at 665.) Borus additionally testified that he felt weak following his back surgery and would tire easily. (*Id.* at 668-69.) Borus did not, however, link his fatigue and other symptoms to the adrenal insufficiency but rather indicated that they were caused by his back surgery. The ALJ determined that no medical records suggested that the condition imposed significant limitations on his ability to perform work-related activities. (*Id.* at 24, 28.) Indeed, the medical records establish that the condition predated the onset of Borus's alleged disability, and that the condition did not previously prevent Borus from working. (*Id.* at 261.) Accordingly, the Court finds that the ALJ's decision that Borus's adrenal insufficiency was not severe was supported by substantial evidence.

Although Borus had separate surgeries on his right and left hand following his back surgery, he testified that both surgeries were successful. (*Id.* at 663-65.) Borus stated that his right hand felt "fat and swollen," and that his handwriting had suffered since the surgeries, but that both hands were pain free and he did not feel the use of his hands was limited. (*Id.*) No medical records indicate continued problems with either hand, and the Court finds that the ALJ's decision that Borus's hand problems were not severe was supported by substantial evidence.

Finally, Borus testified that he was receiving treatment for rectal problems. (*Id.* at 665-

66.) He stated that he experienced constipation, rectal bleeding, weight loss, and pain. (*Id.* at 665-66.) The problems began after his back surgery, and may have been exacerbated by his pain medication. (*Id.*) A colonoscopy revealed a polyp, which was removed, and hemorrhoids. (*Id.* at 647.) Although the record indicates that Borus experienced pain and discomfort as a result of his rectal problems, the record does not establish that he was significantly limited by the condition. Borus did not testify that the condition affected his ability to work. In fact, Borus's testimony linked the symptoms and limitations he experienced post-back surgery primarily to his back-condition, not to his rectal problems. Accordingly, the Court finds that the ALJ's decision that Borus's rectal problems were not severe was supported by substantial evidence.

### 2. The ALJ's Decision that Borus Could Perform Sedentary Work Was Not Supported By Substantial Evidence

Borus argues that the ALJ failed to give controlling weight to the opinions of Dr. Rachlin and Dr. Rho, who both stated that Borus lacks the RFC to perform sedentary work. (Pl.'s Mem. at 11.) He contends that the ALJ substituted her own opinion for that of Borus's treating physicians, and that the ALJ improperly determined that Borus's testimony was not credible. (*Id.* 11, 18-19) The Commissioner contends that the ALJ gave proper weight to Borus's treating physicians, and that the ALJ appropriately determined that Dr. Rachlin's opinion provided in disability insurance forms that Borus lacked the RFC to perform sedentary work was not well-supported by his clinical notes and other medical evidence. (Def.'s Mem. at 15-16.) The Commissioner further argues that the ALJ properly determined that Borus's subjective complaints that he was not able to work were not fully credible, and that his statements did not support a finding of a disability. (*Id.* at 19.)

Both of Borus's treating physicians determined he lacked the RFC to perform sedentary

14

work. Dr. Rachlin regularly evaluated Borus following his back surgery, and diagnosed Borus
with lumbar spondylosis. (A.R., at 521.) Each of Rachlin's clinical evaluations indicated that
Borus experienced back pain, fatigue, and had difficulty walking and sitting for extended periods
of time. (*Id.* at 310, 313, 318, 321, 324.) Between April 2005 and December 2005, Dr. Rachlin
completed three disability insurance forms, and, on each form, checked a box that stated that
Borus was incapable of minimal sedentary activity. (*Id.*, at 522, 523, 524.) Dr. Rho also offered
the opinion that Borus had a less than sedentary RFC. This opinion was based upon his
determination that Borus was unable to sit for at least six hours and to lift more than five pounds.
(*Id.* at 25, 592-603.) Dr. Rho also observed that Borus's ability to push, pull, and stoop were
limited. (*Id.* at 602-03.) His assessment noted that Borus had an antalgic gait, and diagnosed him
with lumbar radiculopathy. (*Id.* at 592, 600.) Dr. Rachlin's and Dr. Rho's opinions were
supported by the surgical pathology report that confirmed that Borus had degenerative disc
disease. (*Id.* at 116.) They were further supported by Borus's own testimony that he felt unable
to work.

   According to the ALJ, she decided not to give controlling weight to the treating
physicians' opinions, in part, because the opinions were inconsistent with their clinical notes.
(*Id.* at 25-27.) She states that the physicians' clinical notes did not indicate that Borus had any
marked physical limitations, and that their opinions were based solely on Borus's subjective
complaints. (*Id.*) The ALJ also found that neither opinion was supported by any abnormal
clinical or test findings, that the opinions were inconsistent with Borus's testimony, and that the
medical evidence showed that his impairments were substantially cured by his surgeries. (*Id.*)
The Court finds that the ALJ's failure to afford controlling weight to Dr. Rachlin's and Dr.
Rho's opinions was improper, and that her conclusion that Borus was capable of sedentary work

was not supported by substantial evidence.

As an initial matter, it is well-settled that rejecting the opinion of a treating physician solely based on internal inconsistencies is error. *Balsamo*, 142 F.3d at 80 (holding that "the ALJ erred in rejecting the opinions of treating physicians solely on the basis that the opinions conflicted with the physicians's own clinical findings."); *Malarkey v. Astrue*, No. 08 Civ. 9049 (JCF), 2009 WL 3398718, *11 (S.D.N.Y. Oct. 20, 2009). "While an administrative law judge is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician." *Rafaniello v. Apfel*, No. 98 Civ. 4354 (JG), 1999 WL 104594, at *7 (S.D.N.Y. Feb. 23, 1999) (quoting *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983)).

Here, the ALJ discredited the treating physicians' opinions that Borus was incapable of minimal sedentary activity based almost exclusively on purported inconsistencies between their opinions and their clinical notes. Notably, the treating physicians' medical opinions were not contradicted in the administrative record by any other medical opinion. The ALJ merely relied upon her own interpretation of their clinical findings to discredit their opinions. Moreover, the ALJ's conclusion that alleged absence of objective medical findings in their reports regarding Borus's condition implies that such evidence does not exist was also improper. The doctors may simply have concluded the inclusion of such information in the report was not necessary. *See Weiss v. Astrue*, No. 07 Civ. 1039, 2009 WL 2843249 (LEK) (VEB), at *4 (N.D.N.Y. Aug. 31, 2009); *Fox v. Astrue*, No. 05 Civ. 1599, 2008 WL 828078 (NAM), at *8 (N.D.N.Y. Mar. 26, 2008).

The ALJ's decision to discredit the treating physicians' opinions because they were based primarily on Borus's own subjective statements about his symptoms was also improper. Even if

the ALJ was correct in her observation that the treating physicians heavily relied upon Borus's statements about his symptoms, courts have repeatedly observed that "a patient's report of complaints, or history, is an essential diagnostic tool." *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003).

The ALJ's decision to discredit the treating physicians' medical opinions based upon her conclusion that the record lacked any abnormal clinical or test results was improper. Although Dr. Rachlin observed that Borus's spinal fusion was healing well and had good stability, that observation does not support the ALJ's conclusion that Dr. Rachlin's reports showed "normal back and neurological findings." (A.R. at 25) The ALJ was not qualified to opine that Dr. Rachlin's clinical findings indicated that Borus's back was "normal," or offer the opinion that the medical record was devoid of "abnormal" clinical or test findings. Similarly, the ALJ inappropriately questioned Dr. Rho's diagnosis of lumbar radiculopathy based upon testing that indicated that Borus's reflexes, sensory perception and motor strength were normal. (*Id.* at 25-26.) The ALJ did not cite any medical opinion that challenged Dr. Rho's diagnosis, and she was not qualified to question it based on her own interpretation of the meaning of the medical evidence.

The ALJ also improperly discredited the treating physicians' opinions because she determined that their opinions were inconsistent with Borus's testimony at the hearing. Borus did not, as the ALJ contended, testify "to an ability to perform the requirements of sedentary work." (*Id.* at 25-26.) Borus never testified that he could sit for six hours during an eight hour period, but rather testified that he could sit for an hour or two, and then would need to lie down or take a nap. (*Id.* at 668.) Borus repeatedly testified that he would have difficulty working because of his back pain and general weakness caused by surgery. (*Id.* at 24, 668-69.)

17

Furthermore, in rejecting the treating physicians' opinions and Borus's testimony that he was incapable of sedentary work, the ALJ failed to completely assess Borus's RFC in her report. The ALJ decided that Borus was capable of sedentary work based almost entirely on Borus's purported ability to sit and stand for the requisite time. Not only was this conclusion not supported by the medical record, the ALJ additionally failed to take into account other limitations in Borus's ability to perform sedentary work. For instance, Dr. Rho identified that Borus was unable to lift more than five pounds, and had limitations in his ability to push, pull, and stoop. (*Id.* at 602-03.) Although the ALJ noted that the demands of sedentary work involve lifting no more than ten pounds, the administrative record contains no evidence that Borus was able to lift this amount. Borus testified that he was unable to lift more than an eight pound gallon of milk, and the ALJ's decision cited to no evidence that he could lift more than ten pounds. (*See Id.* at 24-29, 667.) The ALJ also never made any explicit findings regarding Borus's physical ability to push, pull, or carry.

In sum, the Court finds that the ALJ's decision to not give controlling weight to the treating physicians' opinions that Borus was not capable of performing sedentary work was not supported by substantial evidence. Given the length of the treatment relationship between Borus and his treating physicians and the medical evidence that supported their opinion, the ALJ was required to give their opinions controlling weight. At a minimum, the ALJ had a duty to further develop the record to clarify the basis for the treating physicians' opinions, which she did not do. *See Medina v. Barnhart*, No. 03 Civ. 0079 (SAS), 2004 WL 487310, at *9 (S.D.N.Y. Mar. 11, 2004) ("Where an ALJ finds inconsistencies in a treating physician's report(s), he bears an affirmative duty to seek clarification.") The administrative record is devoid of any medical opinion stating that Borus was capable of performing sedentary work, and the ALJ was not

18

qualified to discredit Dr. Rachlin's and Dr. Rho's opinions based upon her own interpretation of the meaning of their clinical notes. Accordingly, the Court determines that the ALJ's decision that Borus was capable of performing sedentary work is not supported by substantial evidence.

### 3. The ALJ's Use of the Medical Vocational Guidelines was Improper

The ALJ determined that Borus was capable of performing his past relevant work as a stockbroker, and, alternatively, that the Medical Vocational Guidelines[10] (the "grids) Rules 201.21 and 201.28 directed a finding that Borus was capable of performing a wide range of sedentary work. (R.A. at 27.) Borus contends that the ALJ's use of the grids was improper because of his "significant nonexertional impairments, such as fatigue, pain, and weakness." (Pl.'s Mem. at 21-24.) The Commissioner contends that Borus's nonexertional impairments were not significant enough to affect sedentary work activities, and therefore the ALJ appropriately applied the grids. (Def.'s Mem. at 23.)

The grids are generally used by ALJs to determine whether a claimant can perform any work in the national economy. *Martin v. Astrue*, No. 07 Civ. 391 (LAP) (RLE), 2009 WL 2356118, at * 13 (S.D.N.Y. July 30, 2009) (citing *Rosa*, 168 F.3d at 78). Typically the grids are dispositive of whether a claimant can perform any gainful work. *Id.* However, "exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Id.* Moreover, "sole reliance on the grid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work the claimant can perform." *Id.* A

---

[10]The Medical Vocational Guidelines, commonly referred to as the "grids," and found at 20 C.F.R. Pt. 404, Subpt. P, App. 2, take into account a claimant's RFC in conjunction with age, education, and work experience to indicate whether a claimant can engage in other substantial work that exists in the national economy, and, therefore, whether the claimant is disabled.

nonexertional impairment is a limitation "imposed by the claimant's impairments that affect her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain. *Id.* n. 2 (citing *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997)). If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).

Here, Borus testified that he experienced significant fatigue and pain as a result of his back problems, rectal problems, and adrenal insufficiency. This testimony was supported by the medical records, which, as discussed above, consistently report that Borus felt significant pain and fatigue since his surgery. Although the Court has determined that the ALJ's decision regarding the severity of Borus's rectal problems and adrenal insufficiency was supported by substantial evidence, that does not mean that those ailments did not contribute significantly to Borus's feelings of fatigue, weakness, and pain. Given the degree of Borus's nonexertional limitations, the ALJ's was precluded from using the grids because the grids did not take into account his pain and fatigue. Accordingly, the ALJ was required to consult with a vocational expert to clarify the jobs in that national economy that Borus was capable of performing. Therefore, even if the ALJ's decision that Borus was capable of performing past relevant work was supported by substantial evidence, the Court would still order the case to be remanded for the ALJ to consider, with the aid of a vocational expert, whether Martins pain and fatigue are significant nonexertional impairments that limits the jobs he can perform in the national economy.

**E. Remedy**

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand for additional fact development may be appropriate if "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). Alternatively, a remand solely for the calculation of benefits is warranted when a court finds persuasive proof of disability and no apparent basis to conclude that a more complete record might support the Commissioner's decision. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Rosa*, 168 F.3d at 83. Remand for the calculation of benefits is particularly warranted where "a claimant has already waited a substantial amount of time since first applying for benefits." *Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998).

In this case, the Court finds no basis for concluding that a more developed record might support the Commissioner's decision. The only two medical experts who offered an opinion regarding Borus's RFC, both determined that Borus was unable to perform sedentary work, and the ALJ's failure to give controlling weight to their opinions was not supported by substantial evidence. Moreover, Borus first applied for disability benefits more than six years ago, and a remand for factual development will further delay his receipt of benefits. Accordingly, the Court recommends that the case be remanded solely for the calculation of benefits.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Borus's motion be **GRANTED**, and the case be **REMANDED** to the Social Security Administration solely for the calculation of benefits. Pursuant to Rule 72, Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written

objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Paul A. Crotty, 500 Pearl Street, Room 735, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections in both the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**Dated: April 13, 2011**
**New York, New York**

The Honorable Ronald L. Ellis
**United States Magistrate Judge**

**Copies of this Report and Recommendation were sent to:**
Plaintiff's attorney
Jeffrey David Delott
366 North Broadway, Suite 410
Jericho, NY 11753

Defendant's attorney
John E. Gura, Jr.
U.S. Attorney's Office
86 Chambers Street
New York, NY 10007